## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ECOLAB INC. and ECOLAB USA INC.,  )
                             )
      Plaintiffs,        )
                             )
      v.           )     Civil Action No. 23-519-GBW-SRF
                             )
RECKITT BENCKISER LLC,     )
                             )
      Defendant.        )

## REPORT AND RECOMMENDATION

Pending before the court is the parties' claim construction dispute regarding six disputed terms in United States Patent Nos. 8,138,138 ("the '138 patent") and 8,389,464 ("the '464 patent;" together with the '138 patent, the "Asserted Patents"). The Asserted Patents are generally directed to solid detergent compositions containing sodium carbonate and water that are dimensionally stable. ('138 patent, Abstract) Plaintiffs Ecolab Inc. and Ecolab USA Inc. (together, "Ecolab") brought this patent infringement action against defendant Reckitt Benckiser LLC ("Reckitt") on May 12, 2023, alleging that Reckitt's detergent tablet formulations, including Finish Powerball Max in 1 Tablets, Finish Powerball Deep Clean Tablets, and Finish Powerball Classic Tablets (the "Accused Products") infringe the Asserted Patents. (D.I. 1) Following a review of the parties' corrected joint claim construction brief (D.I. 78) and the associated appendices (D.I. 59; D.I. 74), and after consideration of the arguments presented at the *Markman* hearing held on September 5, 2024 (D.I. 85), I recommend that the court adopt the following constructions for the disputed terms:

| Term | Recommended Construction |
|------|--------------------------|
| "consisting essentially of" (all claims, both patents) | The legal meaning of this transitional phrase is that the claims are limited to the specified ingredients and those that do not materially affect the basic and novel properties of the claimed invention.

The basic and novel properties of the claimed invention are that it is a solid detergent composition that, when heated at 120°F, has a growth exponent of 2% or less. |
| "the solid detergent composition is a hydrate solid" (all claims, both patents) | A solid detergent composition formed at least in part through ash hydration (interaction of the sodium carbonate with the water) in the presence of the polycarboxylic acid polymer. |
| "water" (all claims, both patents) | Plain and ordinary meaning. |
| "growth exponent" (all claims, both patents) | The growth of the solid detergent composition after being heated, as measured by the sum of the percent change in height and diameter for a formed product such as a tablet, or by the percent change in the diameter for a cast product such as a capsule. |
| "at least one functional ingredient" (all claims, both patents) | At least one material that provides desired functionalities to the solid detergent composition. |
| "about" ('138 patent, claim 1) | a polymer having a molecular weight within the range of variation from the specified number that is customary for the measurement techniques used by the manufacturer |

## I.    BACKGROUND OF THE TECHNOLOGY

The Asserted Patents are directed to dimensionally stable detergent compositions. Prior art sodium carbonate-based detergents often swelled after solidification, which interfered with packaging, dispensing, and use of the detergents. ('138 patent, col. 1:28-31) The swelling of the solid materials was caused by the unstable nature of hydrated sodium carbonate when stored at ambient temperatures of manufacture and storage. (*Id.*, col. 1:31-41)

The Asserted Patents recite detergent compositions having dimensional stability due to their limited growth exponent. (*Id.*, col. 1:65-2:54) The specification of the '138 patent defines

2

the growth exponent as "refer[ring] to the percent growth or swelling of a product over a period of time after solidification under normal transport/storage conditions." (*Id.*, col. 3:57-60) In the claimed compositions, a polycarboxylic acid polymer, sodium carbonate, and water interact to form a hydrate solid. (*Id.*, col. 3:32-44) Functional ingredients, such as hardening agents, may also contribute to the uniform solidification of the claimed compositions. (*Id.*, cols. 5:40-63, 9:42-46)

Independent claim 1 of the '138 patent, which contains all six of the disputed claim terms, recites:

> A solid detergent composition consisting essentially of:
>
> > a polycarboxylic acid polymer selected from the group consisting of: a polyacrylic acid polymer having a molecular weight of between about 1,000 and about 100,000, a modified polyacrylic acid polymer having a molecular weight of between about 1,000 and about 100,000, and a polymaleic acid polymer having a molecular weight of between about 500 and about 5,000;
> >
> > sodium carbonate;
> >
> > water;
> >
> > less than 0.5% by weight phosphorous; and
> >
> > at least one functional ingredient;
> >
> > wherein the solid detergent composition is a hydrate solid, and if heated at a temperature of 120 degrees Fahrenheit, the solid detergent composition is dimensionally stable and has a growth exponent of less than 2%.

('138 patent, col. 24:6-21)

## II.    LEGAL STANDARD

The purpose of the claim construction process is to "determin[e] the meaning and scope of the patent claims asserted to be infringed." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, 388-90 (1996).  Construing the claims of a patent

presents a question of law, although subsidiary fact finding is sometimes necessary. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 324-26 (2015) (citing *Markman*, 52 F.3d at 977-78). An actual dispute regarding the proper scope of a claim term must be resolved by a judge, as opposed to the jury. *Markman*, 52 F.3d at 979.

"[T]here is no magic formula or catechism for conducting claim construction." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1324 (Fed. Cir. 2005). Instead, the court may attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id.* The words of the claims "are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13 (internal citations and quotation marks omitted). If the meaning of a claim term is not readily apparent, the court considers sources including "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1312 (internal quotation marks omitted). Accordingly, "the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314. Claim terms are typically used consistently throughout the patent, and "usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.* Also, "[d]ifferences among claims can also be a useful guide . . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a

presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15 (internal citation omitted).

The claims must be read in view of the specification, which "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316 (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). The specification may also contain a disclaimer or disavowal of claim scope. *Id.* However, "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (internal quotation marks omitted). The specification "is not a substitute for, nor can it be used to rewrite, the chosen claim language." *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004).

The court "should also consider the patent's prosecution history, if it is in evidence." *Markman*, 52 F.3d at 980. The prosecution history, which is "intrinsic evidence . . . consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

In some cases, courts "will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 574 U.S. at 331. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. Expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips*, 415 F.3d at 1318. Nonetheless, "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Although extrinsic evidence "may be useful to the court," it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19. Where the intrinsic record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999).

## III.   ANALYSIS

As a preliminary matter, the court addresses the parties' dispute regarding the transcript of the *Markman* hearing. (D.I. 89 at 2-3) Ecolab submits an errata sheet to correct four instances in the official *Markman* hearing transcript that Ecolab believes inaccurately reflect what was said in argument. (*Id.*, Ex. 1) Reckitt takes the position that the *Markman* transcript is accurate. (*Id.* at 3)

The court has not relied on the four passages of the *Markman* transcript identified by Ecolab in issuing this Report and Recommendation. In preparing the Report and Recommendation, the court cross-referenced the joint claim construction brief, the joint appendices, the *Markman* hearing transcript, and the slide presentations proffered by the parties during the *Markman* hearing to achieve an accurate understanding of each side's respective position on the disputed issues. The court did not rely exclusively on the *Markman* hearing transcript. Therefore, the issue is moot.

### A.   "consisting essentially of"

| Ecolab's proposal | Reckitt's proposal | Recommended construction |
|---|---|---|
| The legal meaning of this transitional phrase is that the claims are limited to the specified ingredients and those that do not materially affect the basic and novel properties of the claimed invention. | The legal meaning of this transitional phrase is that the claims are limited to the specified ingredients and those that do not materially affect the basic and novel properties of the claimed invention. | The legal meaning of this transitional phrase is that the claims are limited to the specified ingredients and those that do not materially affect the basic and novel properties of the claimed invention. |
| The basic and novel properties of the claimed invention are that it is a solid detergent composition that, when heated at 120°F, has a growth exponent of 2% or less. | The basic and novel properties of the claimed invention are a stable hydrate solid formed through the interaction of water, sodium carbonate and a polycarboxylic acid polymer, | The basic and novel properties of the claimed invention are that it is a solid detergent composition that, when heated at 120°F, has a growth exponent of 2% or less. |

| | which the patents and the relevant prosecution histories also refer to as a solidification matrix. | |
|---|---|---|

The parties agree that "consisting essentially of" is a transitional phrase that limits the claims to the specified ingredients and those that do not materially affect the basic and novel properties of the claimed invention. Unlisted ingredients may be added to the composition only if those ingredients do not affect the basic and novel properties of the invention. *HZNP Medicines LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680, 693 (Fed. Cir. 2019). "[A] drafter will generally include the phrase 'consisting essentially of' before (a) a list of ingredients when dealing with a composition claim, or (b) a series of steps when dealing with a process claim." *Id.* at 692-93.

The focus of the parties' dispute is on the identity of the "basic and novel properties" of the claimed invention. The basic and novel properties of an invention are those characteristics that make the invention advantageous over the prior art. *Id.* at 693; *see also AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1239-40 (Fed. Cir. 2003) (explaining that the basic and novel properties of the invention are defined by the goal of the invention and what distinguishes the invention from the prior art). Ecolab contends that the basic and novel property of the invention is the growth exponent of the solid composition when heated at certain temperatures. (D.I. 78 at 7-8) Reckitt responds that the basic and novel properties of the invention pertain to the interaction of water, sodium carbonate, and a polycarboxylic acid polymer. (*Id.* at 14-15)

I recommend that the court adopt Ecolab's proposed construction, which is supported by the specification and the prosecution history. The written description of the '138 patent describes how prior art sodium carbonate based detergent blocks were "dimensionally unstable" because the detergent blocks tended to swell when sodium carbonate was mixed with water

8

during the solidification process. ('138 patent, col. 1:27-45)  The specification defines a

dimensionally stable composition as one that has a growth exponent of less than 2% when heated

at a temperature of 120 degrees Fahrenheit.  (*Id.*, cols. 1:66-2:15; 3:49-4:3)  The advantage of the

invention over the prior art is the dimensionally stable nature of the claimed composition having

these characteristics.  (*Id.*, cols. 2:58-62; 19:9-22:67); *see AK Steel*, 344 F.3d at 1239-40 (looking

to the specification to determine that "good wetting is the goal of the invention as well as what

distinguishes it from the prior art.").  Ecolab's proposed construction of "consisting essentially

of" captures this advantage over the prior art.

During prosecution of the application leading to the issuance of the Asserted Patents'

parent, U.S. Patent No. 7,763,576, Ecolab amended the claims to overcome the examiner's prior

art rejection based on the Stolte reference, which taught a solidification matrix using

methylglycinediacetic acid ("MGDA") and water as a binding agent.[1]  (D.I. 74, Ex. 4 at JA58)

To overcome the reference, the applicant changed the word "comprising" to "consisting

essentially of" and added a limitation that the growth exponent must be less than 2% when

heated at temperatures of 120 degrees Fahrenheit.  (*Id.* at JA49-55)  The applicant argued that

these amendments overcame the prior art references because the addition of MGDA to the prior

art composition was known to result in a growth exponent of greater than 2% at 120 degrees

Fahrenheit.  (*Id.* at JA58)  The applicant expressly described the "basic and novel

characteristic(s) of the claimed invention" in terms of the dimensional stability of the

composition, "exclud[ing] components that would result in a composition that is not

---

[1] The prosecution history of the parent patent application is relevant where, as here, it addresses limitations in common with the Asserted Patents. *See E.I. du Pont de Nemours & Co. v. Unifrax I LLC*, 921 F.3d 1060, 1070 (Fed. Cir. 2019) (describing circumstances where "familial patents inform the construction of a claim term and are appropriately treated as intrinsic evidence.").

dimensionally stable or that has greater than a 2% growth exponent after heating at a particular temperature." (*Id.* at JA55)  This language from the prosecution history "serves as the foundation for [Ecolab's] proposed definition[ ] for 'consisting essentially of' and the basic and novel properties of the invention." *San Rocco Therapeutics, LLC v. Bluebird Bio, Inc.*, C.A. No. 21-1478-RGA, 2024 WL 2747111, at *5 (D. Del. May 29, 2024).

Consistent with the examiner's ultimate allowance of the parent application, the examiner of the '138 patent allowed the claims over the prior art "because of the more limited scope of the amended claims: 'consisting essentially of[,]' and 'wherein if heated at a temperature of 120 degrees Fahrenheit, the solidification matrix is dimensionally stable and has a growth exponent of less than 2%[.]'"  (D.I. 74, Ex. 5 at JA64; *see also* D.I. 59, Ex. D at 170)  The notice of allowance confirms that the examiner viewed the "consisting essentially of" language as limiting the scope of the invention to the recited ingredients and those that would not materially affect the growth exponent of the solidification matrix at the specified temperature. (*Id.*, Ex. 5 at JA64); *see San Rocco*, 2024 WL 2747111, at *3-6.

Reckitt argues that Ecolab's proposed construction should be rejected because the applicant's definition required only "a particular temperature," as opposed to 120 degrees Fahrenheit, and the prosecution history focuses on achieving a low growth exponent, as opposed to a growth exponent of less than 2%. (D.I. 78 at 12-13)  But the applicant's reference to "a particular temperature" during prosecution of the parent application refers to the claim amendment reciting "a solidification matrix consisting essentially of components that, if heated at a temperature of 120 degrees Fahrenheit, is dimensionally stable and has less than a 2% growth exponent." (D.I. 74, Ex. 4 at JA55)  Moreover, the applicant expressly included the 2% growth exponent requirement in the definition of the basic and novel characteristics of the

10

claimed invention during prosecution, and all the asserted claims in this case reference a growth exponent of less than 2%.  (*Id.*; D.I. 85 at 28:2-16)

Reckitt also contends that the scope of the claims under Ecolab's proposed construction is identical regardless of whether the term "comprising" or "consisting essentially of" is used because the applicant also expressly wrote the basic and novel properties into the claims.  (D.I. 78 at 13)  Specifically, the limitation requiring a growth exponent of less than 2% after heating to a temperature of 120 degrees Fahrenheit excludes any unrecited elements that materially affect the basic and novel properties of the invention.  (*Id.*)  Reckitt states that "[t]here has to be something more to the basic and novel properties of the claimed invention that is not already in the claims."  (*Id.*)  But Reckitt's proposed construction suffers from the same purported deficiency by mirroring the claim limitations reciting a stable hydrate solid formed through the interaction of water, sodium carbonate and a polycarboxylic acid polymer.  (D.I. 85 at 15:15-22)  Reckitt's argument is unsupported by case authority and is otherwise unpersuasive.

Reckitt's proposed construction focuses on the interaction of the key ingredients in the claimed composition, as opposed to the growth exponent.  (D.I. 85 at 29:13-21)  According to Reckitt, the problem in the prior art was the migration of water molecules when the composition was exposed to heat and humidity, and the invention solved this problem by combining three specific ingredients that control the rate and movement of water to increase the stability of the product.  (*Id.* at 33:7-34:9)  Reckitt acknowledges that dimensional stability is "definitely part of the basic and novel properties" but suggests it is not necessary "to spell it all out with growth factor of 2 percent, or say it's dimensionally stable[.]"  (*Id.* at 31:23-32:5, 36:20-25)  This conflicts with Federal Circuit precedent stating that basic and novel properties should be defined by looking in the intrinsic record to determine the goal of the invention and what distinguishes it

11

from the prior art. *See AK Steel*, 344 F.3d at 1239-40. The reference in Reckitt's proposed construction to "a stable hydrate solid" provides no meaningful guidance on how to define or measure stability.

Reckitt's proposed construction may also exclude other recited ingredients in the claims, such as "less than 0.5% by weight phosphorous" and "at least one functional ingredient." ('138 patent, col. 24:16-17) The specification describes how phosphates and functional ingredients such as hardening agents contribute to the solidification process. (*Id.*, cols. 1:48-51, 9:41-55, 16:47-51) Although Reckitt argues that these claim elements would not be excluded because the "consisting essentially of" language "can only serve to exclude _un_recited ingredients that interfere with those properties," (D.I. 78 at 24), Reckitt later states that, because "hardening agents are not claimed, and given the 'consisting essentially of' language in the claims, no such unclaimed hardening agents could be used if they interfered with the entire detergent composition becoming a hydrate solid," (*id.* at 57).

### B. "the solid detergent composition is a hydrate solid"

| Ecolab's proposal | Reckitt's proposal | Recommended construction |
|---|---|---|
| A solid detergent composition formed at least in part through ash hydration (interaction of the sodium carbonate with the water) in the presence of the polycarboxylic acid polymer. | A detergent composition solidified by ash hydration, not pressing a particulate mixture together.<br><br>Ash hydration in this context is where water, sodium carbonate and a polycarboxylic acid polymer interact to form a stable solid composition. | A solid detergent composition formed at least in part through ash hydration (interaction of the sodium carbonate with the water) in the presence of the polycarboxylic acid polymer. |

The parties raise three disputes regarding the proper construction of "the solid detergent composition is a hydrate solid." First, they dispute whether "ash hydration" is the interaction of

sodium carbonate with water, or whether it is the interaction of sodium carbonate, water, and a polycarboxylic acid polymer. Next, they disagree on whether the claimed "hydrate solid" is formed only through the interaction of sodium carbonate, water, and a polycarboxylic acid polymer, or whether the formation of the hydrate solid can also include other functional ingredients. Finally, the parties dispute whether the solid detergent composition is formed "at least in part through ash hydration," or whether it is formed solely by ash hydration. I recommend that the court adopt Ecolab's proposed construction, which is supported by the intrinsic record.

The parties' competing constructions of the "hydrate solid" limitation reflect different understandings of "ash hydration." Ecolab defines ash hydration in a manner consistent with the specification, which describes ash hydration as "the interaction of the sodium carbonate with water." ('138 patent, col. 3:32-34) The polycarboxylic acid polymer is part of the mixture that "control[s] the kinetics and thermodynamics of the solidification process" to form a hydrate solid, but it is not part of the ash hydration process. (*Id.*, col. 3:34-36) Reckitt relies on statements made by the applicant during prosecution of the '138 patent that "[a] stable hydrate solid is formed through the interaction of water, sodium carbonate and a polycarboxylic acid polymer" to support its position that ash hydration requires a combination of water, sodium carbonate, and a polycarboxylic acid polymer. (D.I. 59, Ex. D at 339; D.I. 78 at 57) But Reckitt cites no evidence to support its position that a "hydrate solid" and "ash hydration" are equivalent. This same paragraph of the prosecution history includes a representation that "the solidification mechanism of the current detergent occurs through ash hydration, or the interaction of the sodium carbonate with water," consistent with Ecolab's proposal. (*Id.*)

Reckitt's proposed construction also limits the formation of a hydrate solid to the combination of three ingredients: water, sodium carbonate, and a polycarboxylic acid polymer. (D.I. 78 at 42)  However, for the reasons explained at § III.A, *supra*, the claim does not limit the formation of the hydrate solid to these three ingredients because other recited "functional ingredients" play a role in the hardening process. ('138 patent, cols. 9:41-55, 16:47-51)

Finally, the parties dispute whether the claimed hydrate solid composition must be formed only through ash hydration, or whether it may be formed through a combination of ash hydration and compression.  Examples in the specification support Ecolab's position that a combination of ash hydration and pressing may be used to form the composition.  ('138 patent, col. 19:19-63)  The specification describes a composition containing a polycarboxylic acid polymer, sodium carbonate, several other ingredients, and water which are mixed to form the composition into a solidification matrix and are then "pressed into a tablet at approximately 1000 psi for approximately 20 seconds." (*Id.*, col. 19:41-59)  These examples depict a combination of methods in which the composition's ingredients are mixed to promote solidification and the mixture is then physically pressed into tablet form.  (*Id.*)

Reckitt argues that the applicant disavowed forming the hydrate solid through pressing during prosecution of the '138 patent, relying on statements made to overcome the Van den Brom reference.  (D.I. 78 at 48-51)  In response to the examiner's first rejection, the applicant amended certain claims "to recite that the claimed components interact to form a hydrate solid. . . . [N]either Van den Brom nor Roach disclose the formation of a hydrate solid, but rather, a solid is formed by applying high pressure to a powder material." (D.I. 59, Ex. D at 315)  When the examiner rejected the application a second time based on Van den Brom, the applicant reiterated

that the hydrate solid "is formed through the interaction of water, sodium carbonate and a polycarboxylic acid polymer," whereas

> Van den Brom discloses a detergent block formed by granulating a building material, drying the granulated building material, spraying the granulated building material with a compression aid, and compressing the particulate mixture in a mould.

(D.I. 74, Ex. 10 at JA124-25)  The applicant further highlighted "[t]he detrimental effect water has on the detergent compositions of Van den Brom," "[i]n contrast to a hydrate solid in which water, sodium carbonate and polycarboxylic acid polymer interact to form a stable composition[.]"  (*Id.*, Ex. 10 at JA125)  Moreover, "none of the examples in Van den Brom include sodium carbonate."  (*Id.*)

These statements do not rise to the level of a clear and unmistakable disavowal of a process that combines pressing with solidification via ash hydration to achieve a stable hydrate solid.  The standard for disavowal of claim scope is exacting, requiring a clear and unmistakable disclaimer, and the patentee should benefit from the full scope of the claim language absent a clear disavowal of the full scope. *Thorner v. Sony Computer Ent'mt Am. LLC*, 669 F.3d 1362, 1366-67 (Fed. Cir. 2012).  The applicant focused on the fact that water creates instability in Van den Brom and, for this reason, the detergent block disclosed in Van den Brom required pressing for solidification because it could not solidify through ash hydration.  (D.I. 74, Ex. 10 at JA124-25)  Statements in the prosecution history contrasting the exclusive pressing of Van den Brom with the ash hydration process in the claimed invention do not amount to a clear and unmistakable disavowal of a process that combines ash hydration and pressing.  To conclude otherwise would exclude the examples in the specification disclosing formation of the claimed product through a combination of ash hydration and compression.  ('138 patent, col. 19:19-63; D.I. 85 at 66:12-15)

15

Limiting the formation process to a single method of manufacture is not appropriate where, as here, the patentee has expressly stated that different processes may be used together to achieve the claimed product. *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1375 (Fed. Cir. 2007). The Asserted Patents emphasize the hydrophilic nature of the claimed composition to achieve a level of solidification through mixing the claimed ingredients, and these "process steps can be treated as part of a product claim [because] the patentee has made clear that the process steps are an essential part of the claimed invention." *Id.* But nothing in the Asserted Patents clearly and unmistakably suggests that the solidification of the claimed mixture and the process of pressing are mutually exclusive. As discussed, the examples in the specification indicate that the claimed hydrate solid can also be pressed. ('138 patent, col. 19:19-63) Consequently, I recommend that the court adopt Ecolab's proposed construction.

### C.  "water"

| Ecolab's proposal | Reckitt's proposal | Recommended construction |
|---|---|---|
| Plain and ordinary meaning. | A solid detergent composition having at least 5% water by weight. | Plain and ordinary meaning. |

The parties dispute whether the term "water" should be given its plain and ordinary meaning, or whether it should be limited to at least 5% volume by weight in the claimed solid detergent composition. I recommend that the court adopt the plain and ordinary meaning of the term in accordance with Ecolab's proposal, which is supported by the claim language and the specification. The specification describes embodiments that include as little as 2% water by weight, as do certain claims in the Asserted Patents. ('138 patent, col. 2:33-34, claims 9, 12, 19; '464 patent, claim 12) Reckitt's proposed construction would read these embodiments and claims out of the Asserted Patents. *See, e.g.*, *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d

16

1364, 1369 (Fed. Cir. 2003) ("[C]onstruing a claim to exclude a preferred embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support.") (internal quotation marks omitted); *Merck Sharp & Dohme Corp. v. Hospira Inc.*, 221 F. Supp. 3d 497, 520 (D. Del. 2016) (declining to adopt a construction that would exclude a dependent claim from the scope of the associated independent claim).

Reckitt contends that Ecolab disclaimed water by less than 5% during prosecution to overcome the prior art Van den Brom reference, which taught water by less than 5%. (D.I. 78 at 34) During prosecution of the '138 patent, the applicant distinguished its invention from this reference by explaining that Van den Brom was not stable unless the moisture of the granulated builder was less than 5% and preferably less than 3%, whereas a greater weight percentage of water did not negatively impact the stability of the claimed hydrate solid. (D.I. 74, Ex. 10 at JA125-26) The applicant also corrected the examiner's misunderstanding that Van den Brom taught a solid detergent block having 5% water by weight. The applicant explained that the granulated builder had a moisture content of 5.01%, and because the granulated builder made up 35.78% of the overall detergent block, the moisture level of the detergent block was only 1.78%. (*Id.*, Ex. 10 at JA126)

The applicant's statements during prosecution of the '138 patent do not amount to a clear and unmistakable disavowal of compositions having less than 5% water by weight. (D.I. 85 at 76:21-23) (acknowledging that "there's not as much evidence for this disclaimer as there is for hydrate solid."). Contrary to Reckitt's position, the applicant did not expressly state that the claimed composition required at least 5% water by weight. Instead, the applicant explained that "[a] greater weight percentage of water *can be* added in the present invention because it is a hydrate solid." (D.I. 74, Ex. 10 at JA126) (emphasis added). These statements were made by

17

the applicant on August 18, 2011, before the application leading to the issuance of the '464

patent was filed. (*Id.*) Yet dependent claim 9 of the '464 patent recites a composition with water

constituting "between about 2% and about 50% by weight of the composition." ('464 patent,

col. 24:52-54) This intrinsic evidence reinforces Ecolab's position that the applicant did not

intend to disavow all compositions having less than 5% water by weight.

### D.    "growth exponent"

| Ecolab's proposal | Reckitt's proposal | Recommended construction |
|---|---|---|
| The growth of the solid detergent composition after heated for two days, as measured by the sum of the percent change in height and diameter for a formed product, or by the percent change in the diameter for a cast product. | The growth of the solid detergent composition after being heated at a temperature of 120 degrees Fahrenheit.<br><br>The measured dimension or dimensions used to calculate the growth exponent depends on the shape of the solid product and the manner in which it swells. For tablets, the percentage change in both diameter and height is generally measured and added together to determine the growth exponent. For capsules, just the diameter is normally measured. | The growth of the solid detergent composition after being heated, as measured by the sum of the percent change in height and diameter for a formed product such as a tablet, or by the percent change in the diameter for a cast product such as a capsule. |

The parties agree that "growth exponent" refers to the combined percentage change in

diameter and height for tablets or formed products, and the change in diameter for capsules or

cast products, after the product is heated for a period of time.[2] (D.I. 78 at 59) However, there

are two areas of disagreement: (1) whether the composition must be heated to a specific

---

[2] During the *Markman* hearing, the parties agreed that "tablets" are a type of formed product, but not all formed products are tablets. (D.I. 85 at 81:16-82:14) Similarly, "capsules" are a type of cast product, but not all cast products are capsules. (*Id.*; *see also* D.I. 78 at 60)

temperature of 120 degrees Fahrenheit; and (2) whether the composition must be heated for a specific length of time. I recommend that the court adopt a hybrid version of the parties' proposals, construing "growth exponent" as "the growth of the solid detergent composition after being heated, as measured by the sum of the percent change in height and diameter for a formed product such as a tablet, or by the percent change in the diameter for a cast product such as a capsule."

Ecolab argues that no specific temperature is necessary to define "growth exponent," and its proposed construction contains no limitation on temperature. (D.I. 78 at 59-60) Reckitt responds that the growth exponent should be measured at a specific temperature of 120 degrees Fahrenheit, consistent with the claim language. (*Id.* at 67-68) The detailed description of the invention states that "the growth exponent of a solid detergent product may be determined by measuring one or more dimensions of the product prior to and after heating at between 100° F and 120° F." ('138 patent, col. 3:62-65) This supports Ecolab's position that heating the composition to a precise temperature of 120° F should not be included in the definition of the term "growth exponent."

The specification indicates that a range of temperatures may be used to measure the growth exponent. Reckitt's proposal, which is limited to the specific temperature of 120 degrees Fahrenheit, would exclude an embodiment in which the growth exponent of a capsule is measured after it is heated at approximately 104° F. (*Id.*, col. 21:39-49); *see Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1372 (Fed. Cir. 2022) (explaining that a "claim construction that excludes a preferred embodiment is rarely, if ever correct[.]"). Reckitt supports its position by noting that the claims require heating the composition to 120° F, but this claim limitation would not be necessary if the 120° F temperature was inherent in the definition of "growth exponent."

19

(*Id.*, col. 24:19-21); *see SpaceTime3D, Inc. v. Samsung Elecs. Co., Ltd.*, 2020 WL 7183538, at *12 (E.D. Tex. Dec. 7, 2020) (rejecting the defendant's proposal to include in the proposed construction elements that were "already expressed within the claim limitations themselves.").

I recommend that the court reject Ecolab's proposal to limit the length of time the composition is heated to two days. The detailed description of the invention explains that "[g]rowth exponent refers to the percent growth or swelling of a product over a period of time after solidification under normal transport/storage conditions," without elaborating on the phrase "a period of time." ('138 patent, col. 3:57-60) Ecolab's proposal to limit the length of time to a period of two days is found in a single embodiment in the specification, which describes a capsule being held in an oven at 104° F for two days. (*Id.*, col. 21:42-45) Nothing in the intrinsic record suggests that this two-day period applies to all measures of the growth exponent, or that the length of time for heating a tablet would be the same as the capsule discussed in the example. Thus, there is insufficient support in the intrinsic record[3] to import this limitation from a single embodiment into the claims. *See Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1345 (Fed. Cir. 2008) ("[W]e have repeatedly held that the fact that the

---

[3] Although the evidence in the intrinsic record alone is sufficient, the court's construction finds further support in the extrinsic evidence. For example, in response to Reckitt's interrogatory asking Ecolab to "describe in detail the specific step-by-step test protocol that should be followed to determine whether a detergent composition has the required growth exponent," Ecolab suggested that the "question incorrectly presumes there is only one such test." (D.I. 74, Ex. 14 at JA168, JA173) Instead, Ecolab submitted that "the Asserted Patents themselves teach at least two ways to measure the growth exponent, and . . . one with ordinary skill in the art would understand variations could be made in the parameters relevant to these tests, provided their results for 'growth exponent' of a particular detergent composition would be consistent with the respective tests and results disclosed in the Asserted Patents." (*Id.* at JA173-74) Because the claim language and the specification lack any clear indication that a particular duration of heating is required to ascertain the growth exponent, the inquiry presents a factual question that should be submitted to the jury. (D.I. 85 at 93:1-8); *see ADC Telecommc'ns, Inc. v. Switchcraft, Inc.*, 281 F. App'x 989, 992 (Fed. Cir. 2008).

specification describes only a single embodiment, standing alone, is insufficient to limit otherwise broad claim language.").

The parties use slightly different language to articulate how the size of the composition is measured in the form of a cast capsule or a formed tablet. Consistent with the specification, they agree that the diameter and height of tablets is measured and added together to determine the growth exponent, and for capsules, only the diameter is measured. ('138 patent, col. 3:67-4:3; D.I. 85 at 96:6-19) Reckitt seeks to include an additional sentence from the specification emphasizing that the dimensions used to calculate the growth exponent depend on the shape of the solid product (*i.e.*, a formed tablet or a cast capsule) and the manner in which it swells. But this distinction based on the shape of the product is apparent from the portion of the court's proposed construction specifying that the growth exponent is "measured by the sum of the percent change in height and diameter for a formed product such as a tablet, or by the percent change in the diameter for a cast product such as a capsule."

E.    "at least one functional ingredient"

| Ecolab's proposal | Reckitt's proposal | Recommended construction |
|---|---|---|
| At least one material that provides desired functionalities to the solid detergent composition. | Indefinite. | At least one material that provides desired functionalities to the solid detergent composition. |

I recommend that the court adopt Ecolab's proposed construction, which is consistent with the written description describing that "[t]he functional materials provide desired properties and functionalities to the solid detergent composition." ('138 patent, col. 5:57-59) The specification goes on to provide a host of examples of functional materials, such as alkaline sources which improve soil removal (*id.*, col. 6:5-8), surfactants which provide foaming for dishwashing (*id.*, col. 8:7-11), building agents which prevent metal ions from interfering with

21

other ingredients (*id.*, col. 8:25-33), and bleaching agents which enhance cleaning (*id.*, col. 11:47-50), among others.  Dependent claims 2 and 14 of the '138 patent further specify the types of functional ingredients.  (*Id.*, cols. 24:22-25; 25:24-31)

Reckitt argues that the term "at least one functional ingredient" is indefinite because it requires a subjective assessment of desired properties and functionalities, and the intrinsic record provides no guidance on what might fall outside the parameters of a "functional ingredient." (D.I. 78 at 27)  But Reckitt has not met its burden to show by clear and convincing evidence that the term "at least one functional ingredient" is indefinite. *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1366 (Fed. Cir. 2003).

The primary purpose of the definiteness requirement in 35 U.S.C. § 112 "is to ensure that the claims are written in such a way that they give notice to the public of the extent of the legal protection afforded by the patent, so that interested members of the public . . . can determine whether or not they infringe." *All Dental Prodx, LLC v. Advantage Dental Prods., Inc.*, 309 F.3d 774, 779-80 (Fed. Cir. 2002).  A patent claim is indefinite if, "viewed in light of the specification and prosecution history, [it fails to] inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014).  The claim may be indefinite if the patent does not convey with reasonable certainty how to measure a claimed feature. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341 (Fed. Cir. 2015).  However, if a person of ordinary skill understands how to measure the claimed feature, "there is no requirement for the specification to identify a particular measurement technique." *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1319 (Fed. Cir. 2015).

Here, the specification includes an extensive description of what materials qualify as "functional" materials having "desired" properties.  ('138 patent, cols. 6:4-16:45)  Reckitt has

22

not shown that a person of ordinary skill would need a description of what falls outside the realm

of "functional ingredients," in addition to the specification's extensive list of what falls within

the term, to understand with reasonable certainty when an ingredient is a "functional ingredient."

See *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1366 (Fed. Cir. 2017) (rejecting an

inference of indefiniteness from "a practically limitless number of materials" because "breadth is

not indefiniteness." (internal quotation marks and citations omitted)).  Nor has Reckitt shown

that the formulators' perception of what detergent properties are beneficial "varies so

significantly that reliance on it as a standard renders the claims indefinite." *Sonix Tech. Co., Ltd.*

*v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1379 (Fed. Cir. 2017).  Ecolab supplied an unrebutted

expert declaration stating that one of ordinary skill "would understand that there are certain

characteristics that are desirable or beneficial when formulating a detergent composition[,]" and

those characteristics are apparent from a review of the specification.  (D.I. 74, Ex. 12 at JA151-

52; D.I. 85 at 112:4-11)  On this record, the court cannot conclude that Reckitt has shown by

clear and convincing evidence that the term is indefinite. *Id.* at 1377.

**F.    "about," as used in the phrase "polymer having a molecular weight of . . . about [a specified number]"**

| Ecolab's proposal | Reckitt's proposal | Recommended construction |
|---|---|---|
| a polymer having a molecular weight within the range of variation from the specified number that is customary for the measurement techniques used by the manufacturer | Indefinite. | a polymer having a molecular weight within the range of variation from the specified number that is customary for the measurement techniques used by the manufacturer |

Ecolab's proposed construction is supported by the specification and the extrinsic

evidence.  Ecolab establishes that a skilled artisan would understand the claimed polymer

consists of a large number of repeating molecules, known as monomers, that are bonded

23

together.  (D.I. 74, Ex. 8 at JA104-05, ¶¶ 28-29)  A commercial lot of polycarboxylic acid polymer is made of individual polymer molecules having different numbers of monomers and different molecular weights.  (*Id.*)  Thus, the "molecular weight" of a polymer is understood in the art to refer to an approximated average of the molecular weights of the different polymer molecules.  (*Id.*)  Ecolab's expert explained that the variance arises from slight differences in molecular weights in a given sample "and the variance in measuring techniques employed by a manufacturer[.]"  (*Id.*, Ex. 8 at JA105, ¶¶ 30-31)  The expert subsequently clarified that "any individual technique used to measure molecular weight would have some inherent variation associated with that measuring technique," citing an example in which gel permeation chromatography is used to take multiple measurements of the same polymer sample with varying results.  (*Id.*, Ex. 12 at JA149, ¶ 8)  The expert stressed that she "did not opine on whether different measuring techniques that could be used to measure the molecular weight of polycarboxylic acid polymers would give different values depending on the technique being used by the manufacturer."  (*Id.*)

This description from Ecolab's expert declaration is supported by the specification, which identifies as an example of a commercially available polyacrylic acid polymer "Acusol 445, available from Rohm & Haas LLC, Philadelphia, Pa."  ('138 patent, col. 4:25-28)  The technical data sheet for Acusol 445 identifies its average molecular weight as "around 4500."  (D.I. 74, Ex. 7 at JA90)  Ecolab's expert explained that "[t]his usage of an average molecular weight and the word 'about' is common in the polymer industry[,]" and "a POSITA would understand it to be appropriate to refer to Acusol 445 as having a molecular weight of 'about' or 'approximately' 4500."  (*Id.*, Ex. 8 at JA106, ¶ 32)

24

Reckitt contends that the term "about," as used in the phrase "a polymer having a molecular weight of . . . about [a specified number]" fails to inform those skilled in the art about the scope of the invention with reasonable certainty. (D.I. 78 at 78-79)  According to Reckitt, the term is indefinite based on Ecolab's admission that different techniques exist for measuring molecular weight, and the results will vary depending on which technique is used. (*Id.* at 79)  As previously explained, however, Ecolab's expert clarified that slight variances in the measurement of molecular weight arise even when the same measurement technique is used.  Reckitt provides no evidence demonstrating that a person of ordinary skill would have a different understanding. This lack of evidence distinguishes the instant case from the circumstances in *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, where the Federal Circuit determined that different techniques for measuring molecular weight yielded different values across techniques.  789 F.3d at 1338.  Reckitt has therefore not met its burden to show by clear and convincing evidence that the term is indefinite.  *See Sonix*, 844 F.3d at 1377.

For the first time in its sur-reply, Reckitt shifts its focus to the term "molecular weight," arguing that the Asserted Patents are indefinite because they never specify which molecular weight description is used. (D.I. 78 at 82)  This argument tracks the Federal Circuit's decision in *Teva*, which held that the claim term "molecular weight" was indefinite because it did not "convey with reasonable certainty the measure of molecular weight to be used" and the specification provided no definition or guidance on the meaning of "molecular weight."  Here, however, the disputed term is "about," and Reckitt did not identify "molecular weight" as a term requiring construction in the amended joint claim construction chart. (D.I. 59, Ex. A at 1)

## IV.    CONCLUSION

For the reasons set forth above, I recommend that the court construe the disputed terms as follows:

| Term | Recommended Construction |
| --- | --- |
| "consisting essentially of" (all claims, both patents) | The legal meaning of this transitional phrase is that the claims are limited to the specified ingredients and those that do not materially affect the basic and novel properties of the claimed invention.<br><br>The basic and novel properties of the claimed invention are that it is a solid detergent composition that, when heated at 120°F, has a growth exponent of 2% or less. |
| "the solid detergent composition is a hydrate solid" (all claims, both patents) | A solid detergent composition formed at least in part through ash hydration (interaction of the sodium carbonate with the water) in the presence of the polycarboxylic acid polymer. |
| "water" (all claims, both patents) | Plain and ordinary meaning. |
| "growth exponent" (all claims, both patents) | The growth of the solid detergent composition after being heated, as measured by the sum of the percent change in height and diameter for a formed product such as a tablet, or by the percent change in the diameter for a cast product such as a capsule. |
| "at least one functional ingredient" (all claims, both patents) | At least one material that provides desired functionalities to the solid detergent composition. |
| "about" ('138 patent, claim 1) | a polymer having a molecular weight within the range of variation from the specified number that is customary for the measurement techniques used by the manufacturer |

Given that the court has relied upon material that technically remains under seal, the court is releasing this Report and Recommendation under seal, pending review by the parties. In the unlikely event that the parties believe that certain material in this Report and Recommendation should be redacted, the parties shall jointly submit a proposed redacted version by no later than **November 4, 2024**, for review by the court, along with a motion supported by a

declaration.  Any argument that portions of the Report and Recommendation should be sealed must be supported by "a particularized showing of the need for continued secrecy" sufficient to overcome the strong presumption of public access to court records.  *See In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, 924 F.3d 662, 672, 675 n.10 (3d Cir. 2019) (quoting *Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 998 F.2d 157, 166 (3d Cir. 1993) (internal quotation marks omitted)).  If the parties do not file a proposed redacted version and corresponding motion, or if the court determines the motion lacks a meritorious basis, the documents will be unsealed within fourteen (14) days of the date the Report and Recommendation issued.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2).  The objections and responses to the objections are limited to ten (10) pages each.  The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court.  *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated March 7, 2022, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: October 28, 2024

Sherry R. Fallon
UNITED STATES MAGISTRATE JUDGE